FILED
JAMES J. WALDRON, CLERK

APR 27 2016

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY _____ DEPUTY

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.:    14-30236-ABA |
| Sussex SkyDive, LLC, | Chapter:    11 |
| Debtor. | Judge:    Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

Before the court is a Motion for Payment of Postpetition Rent filed by When Pigs Fly, LLC and William Gennaro (collectively, "WPF"), and the Objection and Counterclaim of the Debtor, Sussex Skydive, LLC. WPF seeks payment for its postpetition storage of an airplane while the Debtor contends that, because WPF refused the Debtor access to the airplane, WPF should pay it damages for violation of the automatic stay. The court finds that WPF is not entitled to postpetition rent, and the Debtor is entitled to damages for violation of the automatic stay.

## JURISDICTION AND VENUE

The matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

On June 4, 2015, WPF and its sole shareholder, Mr. Gennaro, filed the Motion for Payment of Postpetition Rent ("Motion")(Doc. No. 53). The Debtor filed an Objection and Counterclaim on July 6, 2015 (Doc. No. 56). WPF filed a Response on July 23, 2015 (Doc. No. 58). On August 3, 2015, John W. Cooley filed a certification in support of the Debtor's opposition (Doc. No. 59). Mr. Gennaro then filed a certification in opposition to Mr. Cooley's certification, on August 6, 2015 (Doc. No. 61). A Case Management Order regarding discovery was entered by consent on October 20, 2015 (Doc. No. 64). A plenary hearing[1] was held on January 6, 2016 and then

---

[1] The parties consented to the matters being heard as contested matters rather than as adversary proceedings. Doc. No. 71, pp. 3-4.

continued on January 29, 2016. [2] Following the hearing, the court took this matter under advisement and ordered post-hearing submissions. WPF filed a post-hearing brief on March 7, 2016 (Doc. No. 275).[3] The Debtor filed its post-hearing brief on March 21, 2016 (Doc. No. 74). This matter is now ripe for disposition.

## FINDINGS OF FACT

The court finds the following facts relevant to its decision:

1. When Pigs Fly, LLC is a limited liability company incorporated in the State of New Jersey. T1, p. 19.
2. William Gennaro is the sole member of WPF. T1, p. 19.
3. WPF owns 56 hangars located at the Sussex Airport in Wantage, New Jersey. T1, pp. 19-20.
4. WPF rents these hangars to operators of airplanes who require shelter for their airplanes adjacent to Sussex Airport. T1, p. 20.
5. The Debtor owns a Beechcraft A90 King Air airplane ("King Air"). Ex. D-9.
6. John Eddowes is a managing member of the Debtor. T2, p. 43.
7. On August 26, 2011, the Debtor and WPF entered into a lease for a hangar in building #6, unit #1 from August through October 31, 2011. Ex. LL-1; T1, pp. 23, 26.[4]
8. There was no provision in the lease for distraint upon default. Ex. LL-1.
9. The Debtor stored the King Air at the hangar. T1, p. 26; T2, pp. 46-47.
10. After October 31, 2011, by agreement with WPF, the Debtor remained in half of the hangar at half the original rental amount, $1,100 per month. T1, pp. 26-27.
11. The parties stipulated that $1,100 per month was the reasonable value of the use of the hangar for the purposes of an administrative expense. T1, p. 4.
12. The Debtor operated a skydive school from the hangar premises at Sussex Airport until in or about August 2012, when the King Air was damaged while landing. T1, pp. 56-57; T2, pp. 127-128.
13. Within weeks of the incident, an insurance claim in the amount of $275,000 was paid to Fulton Bank as lienholder on the airplane, which it released to the Debtor as repairs were made. T-2, pp. 92-94.
14. The mechanic hired by the Debtor to repair the airplane, Paul Trauschke, last visited the airplane to make repairs in October 2013. T1, pp. 129, 140.
15. The repairs were not completed, despite sufficient funds from the insurance claim, due to waiting for some parts. The airplane was about 90% repaired. All Mr. Trauschke had left was

---

[2] Reference to the transcript of the trial on January 6, 2016 is "T1" (Doc. No. 70), and on January 29, 2016 is "T2" (Doc. No. 71).

[3] WPF filed its brief on the docket of Freefall Adventures, 14-30235-ABA, the lead case in a number of jointly-administered chapter 11 cases, including the chapter 11 case of Sussex SkyDive, LLC.

[4] Mr. Eddowes testified that he authorized his manager to sign the lease on behalf of the Debtor. T2, pp. 45-46. Mr. Eddowes also testified that "Skydive Sussex," the named tenant on the lease, was actually the name of the original owner of the jump center, and that even after he bought the center, everybody still referred to the drop zone as "Skydive Sussex." T2, p. 72. Even Mr. Eddowes later in testimony incorrectly referred to the Debtor as "Skydive Sussex." T2, p. 75. There is no dispute that WPF and the Debtor entered into the lease, despite the misnaming of the Debtor.

to install some propeller governors, a right-hand prop, and final rigging of the engine. T1, pp. 129-130, 141-142; T2, pp. 48, 93.

16. Mr. Trauschke explained that the remaining work on the engine was why the engine cowling[5] had been removed. T1, pp. 129-30.

17. Mr. Eddowes asserted that the repairs were not completed because he was locked out of the hangar. T2, p. 96.

18. Mr. Eddowes testified that, if only he had access to the King Air in October 2014, he could have fixed it in 7-10 days, and then he could have leased the King Air out. T2, pp. 64, 70.

19. The Debtor asserts that it could have flown the King Air in the summer of 2015 to earn a net revenue of $150,000. T2, pp. 65-66, 69.

20. Mr. Eddowes testified that repairing the airplane required two persons. T2, p. 94.

21. The court does not find this assertion credible, as there was no denial that WPF allowed mechanics access to the airplane, just not Mr. Eddowes, therefore nothing was keeping Mr. Eddowes from hiring a second mechanic to assist Mr. Trauschke. See T2, pp. 93-94. Mr. Eddowes was aware that access was being given to other parties. T2, p. 96. In addition, the Debtor made no efforts in this case to gain access to the King Air.

22. The Debtor did not pay rent in November and December 2013. T1, p. 28; T2, p. 75.

23. Mr. Eddowes knew or assumed from messages from Mr. Gennaro that he would not be able to access the hangar until he paid the rent. T2, p. 78.

24. He spoke with his attorney about getting the King Air out, but does not know what if anything his attorney did. T2, pp. 79-80, 86.

25. He did not communicate further with Mr. Gennaro because, he says, Mr. Gennaro made it clear that he would not discuss anything until the rent was paid. T2, p. 86.

26. On December 4, 2013, WPF initiated a landlord/tenant action in the Superior Court of New Jersey for possession of the hangar premises due to nonpayment of rent. Ex. LL-2.

27. The summons and complaint in this action listed Mr. Gennaro as the plaintiff and "John Eddowes dba Sussex Skydive LLC" as defendant. Ex. LL-2.

28. WPF obtained a default judgment against "John Eddowes dba Sussex Skydive LLC" on December 16, 2013. Ex. LL-4.

29. WPF obtained a Warrant of Removal identifying Mr. Gennaro as plaintiff and Mr. Eddowes as defendant. Ex. LL-5.[6]

30. On January 3, 2014, the Warrant for Removal was executed. Ex. LL-5; T1, pp. 38, 42-43.

31. Mr. Gennaro testified that it was at this time that he changed the locks. T1, pp. 41-43, 47-48, 81.

32. Mr. Gennaro testified that he did not want Mr. Eddowes to access the hangar, because he "had been evicted," T1, p. 62, and he was afraid that Mr. Eddowes might attempt to take the plane. T1, p. 97. The court finds this testimony of Mr. Gennaro credible and his contrary testimony, that he wanted the Debtor to retrieve the airplane, T1, p. 96, not credible.

---

[5] A cowling is the removable cover of a vehicle or aircraft engine.

[6] As will be explained later, the court makes no finding as to whether the Warrant of Removal was effective against the Debtor.

33. Despite this change in locks, and because the hangar at times[7] was shared with another tenant, the hangar was often open. Exs. D-2, D-6; T1, pp. 104, 87-88.

34. Mr. Gennaro believed that he only had to retain the contents of the hangar premises for 30 days. T1, p. 47; T2, p. 31.

35. This belief was based on a conversation with the officer that executed the Warrant of Removal and from Mr. Gennaro's prior experience as a landlord in New Jersey. T1, pp. 43, 46; T2, p. 31.

36. Mr. Gennaro did not notify the Debtor in advance that if the Debtor did not retrieve its property from the hangar, he would dispose of it. T2, pp. 26-27.

37. After 30 days, Mr. Gennaro cleaned the hangar premises, moving airplane parts and other personal property to a smaller hangar at the airport, but leaving the airplane. T1, pp. 49-50, 86. The parts removed included "[c]owlings, stuff that looked like it belonged on the airplane, in the airplane." T1, p. 50.

38. Mr. Gennaro testified that the amount of parts would fit "[a] room full of desks." T1, p. 89. The court finds more credible Mr. Trauschke's testimony that the amount of parts could have easily been stored inside the aircraft, or on two tables, maximum. T1, p. 147.

39. Though Mr. Gennaro stated he did this for safe-keeping, T1, pp. 97, 106, he did not explain why the parts would not have been safe where they were.

40. Mr. Gennaro also then discarded some property that he considered junk, such as used tires, cinder blocks, broken furniture, and cardboard boxes. T1, pp. 47-48, 50-51; T2, pp. 31-32.

41. At some point, some of the airplane's avionics had been removed by Mr. Gennaro. T1, pp. 133, 135. The court bases this finding that Mr. Gennaro removed the avionics on the fact that the hangar's lock had been changed by Mr. Gennaro, that the airplane had been moved, that there was no reason given that the parts were safer in another hangar than the one they were in, and that Mr. Gennaro had the motive to keep the airplane from being flyable.

42. Mr. Gennaro did not advise the Debtor that he was disposing of property from the hangar. T2, p. 26.

43. WPF did not confirm with the Debtor that the Debtor had abandoned the airplane or its parts. T1, p. 91; Exs. D-2, D-6.

44. On October 2, 2014, the Debtor filed a petition under chapter 11.

45. WPF received notice of the bankruptcy filing by correspondence dated October 10, 2014. T1, pp. 93-94; T2, p. 10; Ex. D-3.

46. WPF received a letter from Fulton Bank advising it that the airplane was collateral of Fulton Bank and was protected by the bankruptcy stay. Exs. D-3; T1, p. 94.

47. WPF did not assert to Fulton Bank that it owned the airplane now that it had been abandoned by the Debtor. T2, p. 32.

48. Mr. Trauschke returned to the hanger on October 28, 2014 with Fulton Bank's appraiser, and discovered that the airplane had been moved within the hangar, and that parts were missing, including parts that had been already installed, which he referred to as the "avionics." T1, pp. 131-138; T2, p. 101; ex. D-3. He estimated the value of these parts at $175,000. T1, p. 138.

49. Though Mr. Trauschke had worked on the airplane with the Debtor's mechanic, he never had a problem with items missing or taken. T1, p. 139.

---

[7] WPF leased the other half of the hangar from "March 14 through April 2015." T1, p. 104; T2, p. 20. It is not clear whether this was meant to mean March 2014 or March 14, 2015.

50. The Debtor put his insurance company on notice of a possible second insurance claim in the amount of $135,000 on account of the missing parts from the airplane. T2, p. 103.

51. Mr. Eddowes also filed a police report in connection with the missing parts. T2, p. 105.

52. John W. Cooley was the insurance adjustor in connection with this possible second insurance claim. T2, p. 91.

53. When Mr. Cooley contacted WPF about seeing the airplane, Mr. Gennaro advised that he would allow the insurance company and an appraiser access to the airplane, but not Mr. Eddowes. Debtor's Response, p. 2, ¶ 9; T1, pp. 58-59.

54. Mr. Gennaro advised Mr. Cooley in the summer of 2015 that if Mr. Eddowes set foot in the hangar, Mr. Gennaro would contact police and have Mr. Eddowes charged with trespassing. T1, pp. 85-86, 101-102, 106, 109; T2, pp. 16-17; exs. D-2, D-6. D-8.

55. Mr. Gennaro certified in a filing in this court in August 2015 that he believed that if Mr. Eddowes visited the hangar, he could re-establish the tenancy or steal the airplane. T2, pp. 17-18, 24.

56. He advised Mr. Cooley that if he brought Mr. Eddowes with him, that he would call the police. T2, p. 25.

57. Mr. Eddowes wanted to go with Mr. Cooley to the hangar to determine part by part what was missing, but was told through Mr. Cooley that Mr. Gennaro would not allow him on site. T2, pp. 52-53.

58. WPF did not advise the Debtor that he had moved parts from the hangar. T2, p. 69.

59. Mr. Gennaro did not advise Mr. Cooley that he had parts stored elsewhere. T1, p. 116.

60. WPF did not assert to the insurance adjustors that it owned the airplane now that it had been abandoned by the Debtor. T2, p. 33.

61. The Debtor's attorneys also communicated with Mr. Gennaro regarding allowing access. T1, p. 59.

62. Mr. Eddowes avers that he is waiting to file an insurance claim on behalf of the Debtor until he is able to look at the airplane. T2, p. 103.

63. On May 14, 2015, WPF filed a proof of claim for administrative rent. Ex. LL-10.

64. After receiving the Debtor's Response to his Motion for Payment of Postpetition Rent, that alleged a stay violation in stating that he would not allow Mr. Eddowes on the property, Mr. Gennaro reiterated that he had "no objection to Mr. Cooley visiting the hangar and inspecting the plane without Mr. Eddowes." T2, p. 25.

65. In a certification filed in connection with this contested matter, Mr. Gennaro again stated that he "had a fear that Mr. Eddowes will steal the plane, so I am cautious about allowing access to Mr. Eddowes." Ex. D-8.

66. In another certification, Mr. Gennaro also stated that "I believe the Court understands that Sussex has no entitlement to access to the hangar having been evicted. If lack of access has been a problem for Mr. Eddowes because he no longer has a key, then he has only himself to blame." Ex. D-5.

# DISCUSSION

## I. WPF's motion for an administrative claim

WPF proceeds under 11 U.S.C. § 503(b)(1)(A) for its administrative claim for postpetition rent for storing the King Air and its parts in its hangars. That section provides for the allowance of administrative expenses for "the actual, necessary costs and expenses of preserving the estate[.]" It is well established that rent constitutes an administrative claim.

> There is no question, of course, that the payment of rent for the use and occupancy of real estate ordinarily counts as an "actual, necessary" cost to which a landlord, as a creditor, is entitled. *See Philadelphia Co. v. Dipple,* 312 U.S. 168, 61 S. Ct. 538, 85 L. Ed. 651 (1941); *In re 48th Street Steakhouse, Inc.,* 61 B.R. 182 (Bankr. S.D.N.Y. 1986). In order to survive, a financial entity almost always needs a physical space to occupy. When a debtor owns no suitable real estate of its own, its only choice is to become a tenant, and to assume the obligations of paying periodic rent to a landlord. In such circumstances, therefore, rent is clearly an "actual, necessary" cost of preserving the estate, since the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business. Because bankruptcy proceedings are considered to be equitable, however, the landlord's right to collect monetary relief is somewhat curtailed: a debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease. *See In re Mohawk Indus. Inc.,* 54 B.R. 409 (Bankr. D. Mass. 1985).

*Zagata Fabricators, Inc. v. Superior Air Products,* 893 F.2d 624, 627 (3d Cir. 1990). *See In re Einstein Moomjy, Inc.,* No. 11-34723 NLW, 2012 WL 2884943, at *8 (Bankr. D.N.J. July 13, 2012) (citing *Zagata*).

The right to an administrative claim includes where a lease has terminated prepetition, but the debtor continues to occupy the premises postpetition, as the landlord is still providing services for the premises. *In re Goody's Family Clothing Inc.,* 610 F.3d 812, 818-19 (3d Cir. 2010). The landlord then is still entitled to "a reasonable value for the use and occupancy of its land as an administrative cost[.]" *Id.* (quoting *Zagata Fabricators*), 893 F.2d at 627-28. Alternatively, the landlord can seek relief from the automatic stay to evict the debtor. *Zagata Fabricators,* 893 F.2d at 627-28.

Complete eviction can end any entitlement to an administrative claim, unless the debtor still stores property on the premises. As explained by the *Cornwall* court:

> Eviction is an act committed by the landlord in order to permanently deprive "the tenant of the beneficial enjoyment of the demised premises[.]" *Duncan,* 34 N.J. Super. at 297, 112 A.2d 274. The landlord must clearly indicate an intention "that the tenant shall no longer continue to hold the premises." *Schnitzer v. Lanzara,* 115 N.J.L. 332, 337, 180 A. 234 (1935). If the landlord's actions constitute eviction, the

tenant is justified in abandoning or vacating the premises and is relieved from performing the terms of the lease so long as the tenant actually "abandons or vacates the premises as a result of a wrongful act of the landlord." *Duncan,* 34 N.J. Super. at 297, 112 A.2d 274.

*In re Cornwall Paper Mills Co.,* 169 B.R. 844, 850 (Bankr. D.N.J. 1994). If the debtor still has access to the premises despite eviction, then an administrative claim for rent might apply. *See id.,* at 850 (finding debtor not constructively evicted, as was given a new set of keys and permitted to enter the premises). *See In re Imperial Beverage Grp., LLC,* 457 B.R. 490 (Bankr. N.D. Tex. 2011) (granting an administrative expense claim because the debtor still had access to the leased premises even after a lockout).

But here WPF not only changed the locks, but communicated that one of the members of the Debtor would not be allowed on the premises. In *In re Ace Mortgage Funding, LLC,* No. 08–12645, 2011 WL 1585126 (Bankr. D. Del. April 27, 2011), this was sufficient for the court to hold that as to that portion of the premises, the landlord was not entitled to an administrative expense because the landlord had actively prevented the trustee from gaining access to the leased premises and accordingly there was no benefit to the estate. *Id.,* at *5.

WPF argues that its actions nevertheless benefitted the estate, as it sheltered the airplane and safeguarded the parts. In addition, the court notes that to the extent that the Debtor's position is that the state court eviction proceeding was not effective against it supports that the Debtor should pay holdover rent. The Debtor did benefit from the storage of its aircraft. That others had access to the hangar, as the Debtor complains, does not bother the court as this was foreseeable when the Debtor agreed to pay half the original rent for half of the hangar space—it knew that it might share space with another tenant.

Here, WPF from previous experience, acted in accordance with New Jersey statute following its eviction of the Debtor. T.2., p.47. Once 30 days had passed, WPF believed that the King Air was abandoned and took steps to dispose of items and to secure the King Air. *Id.* at 48-49. But a landlord believing property to be abandoned may take steps to dispose of that property only after giving written notice to the former tenant stating that the property must be removed in not less than 30 days after delivery of the notice (or 33 days if the notice is mailed, whichever comes first), else the property will be sold or otherwise disposed of. N.J. Stat. 2A:18-72, 2A:18-73, 2A:18-74. If the abandoned property is not removed or the tenant does not respond, the landlord may sell the property, or if it reasonably believes its value is so low that the cost of storage and sale would exceed the amount realized from the sale, destroy or dispose of the property. N.J. Stat. 2A:18-74, 2A:18-76(c). Importantly here, though a landlord may take this action if "a. A warrant for removal has been executed and possession of the premises has been restored to the landlord; or b. The tenant has given written notice that he or she is voluntarily relinquishing possession of the premises[,]" it also must "reasonably believe[] under all the circumstances that the tenant has left the property upon the premises with no intention of asserting any further claim to the premises or the property[.]" N.J. Stat. 2A:18-72. WPF does not contend that it complied with the basic notice provisions of the statute and indeed the record lacks any evidence that WPF in fact complied with the statute.

More importantly, Mr. Gennaro on behalf of WPF could not reasonably believe that the Debtor had abandoned the King Air, an asset with a purported value of $250,000 as set forth in its Motion.[8] Likewise, the record reflects that the Debtor through its agents continued to visit the hangar for repair and valuation purposes. The court does not find credible that WPF contacted the Debtor or its agents (e.g. counsel) urging removal of the airplane. On the contrary, WPF tampered with the airplane, removing parts and storing them separate from the airplane. When Mr. Trauschke and Fulton Bank's appraiser came to see the airplane, Mr. Gennaro did not inform them that parts of the airplane were being stored elsewhere. He did not inform Mr. Cooley, the insurance adjustor either. Nor did he question why any of these people were visiting the aircraft, which is what someone believing property was abandoned to him would do. Instead, this was the behavior of one holding property hostage. Certainly if he was concerned that Mr. Eddowes would remove the airplane, he would have stopped anyone else attempting the same.

The Third Circuit disapproves of sanctioning an administrative claim on equitable grounds when the remedy outweighs the inequity sought to be redressed. *See Zagata Fabricators*, 893 F.2d at 629 (reversing bankruptcy court decision denying administrative claim due to landlord's failure to remediate environmental violations). In doing so, the *Zagata* court remarked that instead the tenant/debtor had remedies under contract and New Jersey statutory law. *Id.*, at 628. Here, the Debtor's remedy under New Jersey statutory law allows for denial of storage costs. Section 2A:18-81 provides:

> If a landlord seizes and retains a tenant's personal property without complying with this act, the tenant shall be relieved of any liability for reimbursement to the landlord for storage and removal costs and shall be entitled to recover up to twice the actual damages sustained by the tenant.

N.J.S.A. § 2A:18-82.[9]

WPF failed to comply with the statute. Moreover, WPF could not reasonably believe that the Debtor had abandoned the King Air. WPF tampered with the airplane. The appropriate remedy is relieve the Debtor of any liability to WPF for an administrative claim. Accordingly, WPF's administrative claim will be denied.

## II. Debtor's motion for violation of the automatic stay

The Debtor counterclaimed that by refusing to allow Mr. Eddowes access to the King Air, WPF violated the automatic stay. Section 362(a)(3) provides:

---

[8] Indeed, the Motion, seeking payment of an administrative expense for "preserving the value of this asset," suggests that WPF understood that the King Air and its parts were not abandoned.

[9] To the extent that the Debtor believes that its property was damaged by WPF, it must pursue that claim in a separate adversary proceeding.

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of— . . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . .

11 U.S.C. § 362(a)(3).

By its very terms and except as provided in subsection (b), section 362(a) imposes a stay automatically upon the filing of a bankruptcy petition. *In re Stamper*, No. 03-49235NLW, 2008 WL 724237, at *3 (Bankr. D.N.J. Mar. 17, 2008). The stay "is one of the fundamental debtor protections provided by the bankruptcy laws." *In re Lightfoot*, 399 B.R. 141, 145 (Bankr. E.D. Pa. 2008). "The stay of § 362 is 'automatic' because it is triggered as against all entities upon the filing of a bankruptcy petition, irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed." *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).

WPF concedes that the King Air was property of the estate. WPF Brief, pp. 19-20 ("The Hangar Premises is not the Debtor's property protected by Section 362(a)(3). The King Air is."). WPF complains that it was left in the difficult position of possessing property of the estate inside a hangar that was not property of the Debtor. "WPF should not be required to solve the Debtor's conundrum that the Debtor wanted access to something located where the Debtor could not go." Brief, p. 20. As explained above, WPF had a remedy under New Jersey's Landlord-Tenant laws. That remedy was applicable regardless of whether the Debtor had been validly evicted, as it applies to personal property left on premises by a tenant. By taking its stance, WPF admittedly exercised control over property of the estate in violation of 11 U.S.C. § 362(a)(3).

Moreover, a majority of circuit courts, and the District of New Jersey, have found that creditors have an affirmative duty to turn over property of the estate once notified of a bankruptcy filing. *In re Dean*, 490 B.R. 662, 667 (Bankr. M.D. Pa. 2013) (citing cases from the Seventh, Eighth and Ninth Circuits, and the Sixth and Tenth Circuit Bankruptcy Appellate Panels as the majority, and cases from the Fourth and Eleventh Circuit courts and the Eastern District of Pennsylvania bankruptcy courts in the minority); *Carr v. Sec. Sav. & Loan Ass'n*, 130 B.R. 434, 436 (D.N.J. 1991) ("A secured creditor who is in possession of repossessed collateral in which a debtor in bankruptcy has an interest is required to turn the collateral over to the debtor's trustee upon the filing of the bankruptcy petition."); *In re Dash*, 267 B.R. 915, 917 (Bankr. D.N.J. 2001) (following *Carr*).[10] *See also See Ward v. Edwards*, 07 C 3159, 2007 WL 3046133, at *1 (N.D. Ill.

---

[10] The Debtor cited section 543 for the above proposition, but that section regards property of the estate held by a custodian. Section 101(11) limits a custodian to one who is appointed in a case or proceeding not under title 11, an assignee under a general assignment for the benefit of the debtor's creditors, or an appointed trustee, receiver or agent under applicable law or contract. The legislative history indicates that "custodian" is meant to refer to entities appointed prepetition. H.R. No. 95–595, 95th Cong. 1st Sess. 310 (1977) (*reprinted in* Vol. C, App. Pt. 4(e) Collier on Bankruptcy App. Pt. 4(e)(i) (Matthew Bender 16th ed.)). *See Sensenich v. Ledyard Nat'l Bank (In re Campbell)*, 398 B.R. 799, 811 (Bankr. D. Vt. 2008) (suggesting that, rather than destroy the debtor's personal property remaining in the surrendered residence, the bank could have turned over the property to the trustee). Thus it is not applicable here.

Oct. 10, 2007) (holding that, where a tenant was lawfully evicted prior to filing bankruptcy, the landlord was nevertheless liable for violation of the automatic stay when he set all of the debtor's personal belongings unattended in front of the building).

Section 542 provides that

[A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall *deliver to the trustee,* and account for, *such property* or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a) (emphasis supplied).

A landlord possessing property of a debtor may have an "independent duty" to turn over property once a bankruptcy case is filed. *Ward,* 2007 WL 3046133, at *2. Pursuant to section 542 of the Bankruptcy Code, WPF could have turned over the property to the bankruptcy estate. *Id.*[11]

That WPF was not aware of these options is no defense to violation of the automatic stay. *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 581 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'") (quoting *Barlow v. United States,* 7 Pet. 404, 411, 8 L. Ed. 728 (1833)); *Arista Records, LLC v. Callie,* CIV A 07-712 PGS, 2007 WL 1746252, at *1 (D.N.J. June 15, 2007) (stating the old adage that "ignorance is no defense to the law."); *In re Wittreich,* 5 N.J. 79, 87 (1950). WPF has violated the automatic stay by exercising control over the King Air.

The court next considers whether the Debtor is entitled to damages for this stay violation. Section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).[12]

The court in *In re Rodriguez,* No. 07–24687 (MBK), 2012 WL 589553 (Bankr. D.N.J. Feb. 22, 2012), explained that the test under section 362(k)(l):

---

[11] Had WPF not considered the Debtor evicted, it could have requested relief from the stay under section 362(d). *See Zagata Fabricators,* 893 F.2d at 627 (suggesting the remedy where a tenant neglects to pay rent); *In re Bedroom of Cent. Florida, Inc.,* 150 B.R. 982, 984 (Bankr. M.D. Fla. 1993) (in denying an administrative claim to the landlord, noting that the landlord did not act on its alleged belief that the debtor had not moved out, by seeking an order to lift the automatic stay or an order directing the debtor to pay rent pursuant to section 365(d)(3)).

[12] "Although Section 362(h) refers to an individual, the section has uniformly been held to be applicable to a corporate debtor. *See Budget Service Co. v. Better Homes of Va.,* 804 F.2d 289, 292 (4th Cir.1986)." *In re Atl. Bus. & Cmty. Corp.,* 901 F.2d 325, 329 (3d Cir. 1990).

is 'remarkably simple' and requires the imposition of sanctions on a party violating the automatic stay upon three provisions: First, the offending party must have violated the automatic stay. Second, the violation of the stay must have been willful. Finally, the willful violation must have caused Debtors some injury." 447 B.R. 426, 433 (Bankr. E.D. Pa. 2011) (citing *Wingard v. Altoona Regional Health Systems (In re Wingard),* 382 B.R. 892, 900 n.6 (Bankr. W.D. Pa. 2008)).

*Rodriguez,* 2012 WL 589553, at *3 (citing *In re Miller,* 447 B.R. at 433).

The court has already established that WPF violated the automatic stay. As to the second element of that test, "willfulness can be satisfied by showing simply that the offending party knew about a debtor's bankruptcy but proceeded with the stay violation nonetheless." *Rodriguez,* 2012 WL 589553 at *4 (citation and internal marks omitted). In addition, "[w]illfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *In re Lansdale Family Rest., Inc.,* 977 F.2d 826, 829 (3d Cir. 1992) (the act of applying payments to reduce prepetition debt is intentional).

While WPF does not deny knowing about the bankruptcy filing, it argues that it relied in good faith on the Judgment for Possession and the execution of the Warrant of Removal. But this argument is inapposite, because, as explained above, eviction did not mean that the Debtor could be denied access to its personal property. *Will v. Ford Motor Credit Co. (In re Will),* 303 B.R. 357, 364 (Bankr. N.D. Ill. 2003) (stating that once a creditor learns of the automatic stay, any violation that could possibly be characterized as technical or inadvertent ripens into willful). WPF has not persuaded this court that its good faith reliance on the state court judgment is enough to overcome its willful violation of the automatic stay.

Thus all that is left is whether the violation caused the Debtor any injury. The Debtor claim that, had it been able to fly the airplane in the 2015 season, it would have flown 18,000 to 20,000 slots, for net revenue of $150,000, which it contends should be doubled under state law. Debtor's Brief, p. 25. It also seeks actual damages of attorney's fees and costs, at a minimum for the cost related to preparing a response to WPF's motion, preparing its crossclaim, preparing and participating in trial, and preparing post-trial submissions. *Id.,* p. 28. Finally, it asserts that punitive damages should include denying WPF any claim for rent, prepetition or otherwise. *Id.*

As for attorney's fees and costs, "actual damages in the form of attorneys' fees [can be] appropriate, despite the fact that there may not have been other compensable harm to a debtor." *Rodriguez,* 2012 WL 589553, at *4. However, "[f]or Debtors to recover attorneys' fees . . . such fees must be reasonable and necessary." *In re Miller,* 447 B.R. at 434. *See also Rodriguez,* 2012 WL 589553 at *5 (stating that fees had to be fair and reasonable and that since the creditor's vigorous prosecution "forced" the debtor to litigate the matter, an award of fees was warranted).

In addition, in connection with claims for attorney's fees in stay violation litigation, this court has held that there is a duty to mitigate. *Renzulli v. Ullman,* AP 15-01983-ABA, 2015 WL 9777730, at *1 (Bankr. D.N.J. Dec. 22, 2015); *In re Oakey,* 14-32685-ABA, 2015 WL 5298995, at *2 (Bankr. D.N.J. Sept. 9, 2015). In those decisions, the court cited to, *inter alia, In re Miller,* 447 B.R. 425, 434 (Bankr. E.D. Pa. 2011). The *Miller* court wrote the following regarding a lack of actual damages to the Debtor:

Upon receiving the first three invoices, Debtors tossed them aside to a pile of other papers for future forwarding to their counsel. No fear; no apprehension; no anxiety; no nausea; no concerns; no monetary distress; no emotional distress; no harm. Only because they perceived an issue about a possible increase in Ettinger's legal claim arising from the continually accruing interest shown in the August invoice did Debtors refer the matter to their lawyer—who did nothing. No telephone call to Ettinger; no letter to Ettinger; no email to Ettinger; no fax to Ettinger; no communication at all to or with Ettinger. Mr. Miller provided no testimony whatsoever about any injury that he or his wife suffered as a result of the invoices. Furthermore, Debtors' counsel had no reason to take any action because Ettinger ceased mailing the invoices after the August invoice. Debtors suffered no injury.

*In re Miller*, 447 B.R. at 434.

In making its determination of whether fees are fair and reasonable, the court is further persuaded by the rationale of the *Miller* court which noted:

The policy of section 362[k], to discourage willful violations of the automatic stay, is tempered by a reasonableness standard born of courts' reluctance to foster a 'cottage industry' built around satellite fee litigation." *In re Robinson*, 228 B.R. 75, 85 (Bankr. E.D.N.Y. 1998) (citing *Putnam v. Rymes Heating Oils, Inc. (In re Putnam)*, 167 B.R. 737, 741 (Bankr. D.N.H. 1994)). It is well established that "[r]easonable and necessary fees do not include unnecessary litigation costs." *Id.*; *See also Yarinsky v. Saratoga Springs Plastic Surgery, PC (In re Saratoga Springs Plastic Surgery*, PC), No. 1:03CV896, 2005 WL 357207, at *54 (N.D.N.Y. Feb. 11, 2005), *aff'd*, 172 Fed. Appx. 339 (2d Cir. 2006) ("[A]n 'excessively litigious approach' to violations of the automatic stay that do not cause damages in an[d] of themselves must be guarded against.").

*Miller*, 447 B.R. at 435 (citing *In re Prusan*, No. 09–49716–CEC, 2010 WL 813778, at *3-*4 (Bankr. E.D.N.Y. March 2, 2010) (footnotes omitted). *See also In re Genesys, Inc.*, 273 B.R. 290, 296 (Bankr. D.D.C. 2001) (finding that a debtor has a duty to mitigate damages and fees should not be "completely overblown").

Here the court finds that the Debtor is not entitled to damages for the amount it avers it could have earned by flying (or leasing) the airplane postpetition. Though it alleges it could neither repair nor remove the airplane, remarkably, it filed nothing in this court to force WPF to grant it the access it needed. Rather it acquiesced in WPF's possession since October 2013. In short, it failed to mitigate its damages. The court also finds Mr. Eddowes lacking in credibility in his testimony. For example, if Mr. Eddowes truly did not know of the eviction action, then he had to believe that he still owed monthly rent. Yet the Debtor did not pay. Nor did it take any action since October 2013 to recover the King Air. Just as the court holds WPF to its legal remedies, this court holds the Debtor.

However, this court will award to the Debtor recovery of fair and reasonable fees and costs in prosecuting its counterclaim. WPF argues that damages should be mitigated by its good faith.

But "[w]hether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded." *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990). Though WPF sheltered the airplane, it also removed its aeronautics and stored those parts elsewhere, egregious conduct even if the stay were not involved. Accordingly, the Debtor's counterclaim for damages in the amount of its reasonable attorney's fees and costs will be granted. Unnecessary litigation costs will not be allowed and the court will not allow damages that are completely overblown. The Debtor may submit an itemized breakdown of costs and fees for the court to consider.

### III.    The state court judgment and the *Rooker-Feldman* Doctrine

Finally, the parties debate whether the *Rooker-Feldman* doctrine precludes this court from deciding whether the Superior Court judgment was defective for failing to properly name the parties. The *Rooker-Feldman* doctrine provides that lower federal courts cannot sit in direct review of the decision of a state court. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Thus, the doctrine "'prohibits District Courts from adjudicating actions in which the relief requested requires determining whether the state court's decision is wrong or voiding the state court's ruling.'" *In re Knapper*, 407 F.3d 573, 580 (3d Cir. 2005) (quoting *Walker v. Horn*, 385 F.3d 321, 329 (3d Cir. 2004)). The doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 125 S. Ct. 1517, 1521-22 (2005).

But this court need not analyze the state court judgment. Regardless of whether the state court judgment was effective against the Debtor, as explained by the court at the January 29th hearing, the issue in this case is whether the King Air and its parts, as opposed to the hangar, were property of the estate. T.2, p.114. If so, the automatic stay would be implicated. Nothing in the state court judgment addresses this issue and in fact, WPF admits that the King Air is property of the estate. This is detrimental to WPF's position. Agreeing or disagreeing with the state court judgment would not change this and consequently, no analysis is necessary.

### CONCLUSION

WPF's motion for payment of an administrative claim is denied. The Debtor's motion for sanctions for violation of the automatic stay is limited to its attorney's reasonable fees and costs.[13]

The Debtor may submit evidence of fair and reasonable costs and fees incurred in connection with its counterclaim within 14 days of the date of this Memorandum Decision and WPF may file a response within 7 days of the Debtor's filing of that evidence.

---

[13] As sanctions awarded for the stay violation, not the illegal distraint, the fees and costs will not be doubled under N.J.S.A. § 2A:18-82.

The Court declines to impose any punitive damages or other sanctions on WPF.

The court will contemporaneously issue a separate order consistent with this opinion.

The court reserves the right to revise its findings of fact and conclusions of law.

<u>/s/ Andrew B. Altenburg, Jr.</u>
United States Bankruptcy Judge

Dated: April 27, 2016